al. We will call the first, well, I will remind you that we have a traffic light system. When a yellow light comes on, you have two minutes. When the red light comes on, we ask you to conclude as quickly as possible unless you are answering a question from the court. We are familiar with the briefs and record excerpts, but we have not read the entire record. So if you give us record citations, we'll appreciate it. First case this morning is number 18-10036, Horner v. American Airlines. And we'll hear first from Mr. Jacobson. Good morning, Your Honor. Good morning, Justice. I'm here on behalf of the appellants asking that you reverse the judgment of the trial court below. There are two issues in this case. The first is whether we have sufficiently established a question of fact as to our claim of a breach of a duty of fair representation by the union here, the Airline Pilots Association, or APA. The second is whether the pilots who filed the suit have standing under the statute to challenge the arbitrator's award. I'm going to focus my argument, if the Court wishes, primarily on the DFR claim, since if we establish that there is a breach of DFR, then under your precedent, there is in fact standing to challenge. Judge Fitzwater, the trial judge, concluded that no reasonable jury could find that the The judge was wrong. The evidence is sufficient for a jury to find a breach of the DFR. The evidence is that the APA had an agreement, an understanding, with American Airlines that the phrase, any aircraft, in the trigger for the elimination of the job safety measures in Supplement C, did not include the Category 1 aircraft that were expected to be acquired when America merged with U.S. Air, which was a then-pending merger. This was an agreement. APA and American don't deny, they don't deny that they had this agreement. What was the agreement? The agreement was that the phrase, any aircraft, did not include the Category 1, very short distance aircraft. What did that agreement take the form of? Well, Your Honor, a number of things. There were exchanges of emails between the lawyers who are drafting Supplement C. Those appear in the Record on Appeal at page 882 and 885. There was a testimony by the APA union representative in the U.S. Air, American Airlines-Seniori merger when there was a, when U.S. Airlines was being merged into American Air, there was a set of arbitrations relating how to integrate those CCR lists, and the APA representative testified in those that there was an agreement that would provide that the Category 1 craft would not trigger the termination of the American, excuse me, former TWA pilots' privileges. That's at the Record on Appeal at 797 and 825 through 826. Was this presented to the arbitrator? That was testimony from an arbitrator, yes. Not in this arbitration, in a different seniority arbitration. He was charged with interpreting a written agreement. Can you use oral understandings, side agreements to vary that? He was not charged with interpreting an oral agreement. He was charged, written agreement, he was charged with interpreting the collective bargaining agreement, and a collective bargaining agreement can include not simply the words that are in place, any oral agreements that have become part of the industrial common law of that particular practice. But our claim gets, is directed actually before the case even comes to the arbitrator. It is our contention that the duty of fair representation here was breached when the APA granted the grievance and allowed the grievances to go to arbitration. The record shows that under prior APA presidents, the exact same claim was made by Legacy American Airline pilots who argued that the Supplement C protections had expired. And in each of those cases, that prior president said, no, we have an agreement with American. It doesn't expire just because someone can be a captain on a Category 1. You can see that is in the Record of Appeal at pages 829 through 830 where the prior president of the union says, no, that's not what our agreement does. The Category 1 planes were a small group of planes, 19 planes, very, very different in character from the aircraft otherwise flown, the thousands of aircraft otherwise flown by the airline. These were similar to commuter airline planes, and they were a vestige of U.S. Airways early days as a local, not long-distance carrier. And they had these planes, and everyone knew that being a captain of a Category 1 plane was completely different in kind, undesirable as a job. Are those the Embraers or something like that? I believe that's what they call them, Your Honor. Thank you. Well, but after all this evidence was presented to the arbitrator, and he took the other side and said that they were, that Group 1 aircraft did qualify, you've got the standard to refuse from an arbitrator, huh? Well, Your Honor, this is, this is on the DFR claim, which is, on the DFR claim, the question is whether American Airlines, whether APA violated its duty of representation by presenting the claim to the arbitrator, by allowing the claim to even go to the arbitrator. Because APA knew that it had agreed that these Category 1 aircraft were not to be included, and since the grievance was, oh, American is violating our contract because they're allowing former TBA pilots to still have preferential flying rights, even though they can now be a captain on a Category 1, the APA should have, as it had agreed with American previously, and as had previously done, said, sorry, this grievance is denied. By allowing the grievance to go to arbitration, they violated their duty of representation. Then, to double up on the violation, once it was there, they took a protectual neutrality in the claim. They said, oh, we have no opinion, one way or the other, we're neutral on this issue. That was another breach of DFR. Now, they'll try to tell you, in their briefs they say, oh, we're allowed to be neutral because this is a seniority integration, zero-sum game type of thing, and someone's going to win, somebody's going to lose, so we have to stay out of it. Zero-sum, we have, I think, advanced enough in the law that we are no longer in the period of magical words and magical phrases. Just saying zero-sum game does not mean that it's an area where the union cannot make a decision. The case law is very clear that unions have to make decisions even when they will advantage some and disadvantage others. The area where unions are supposed to be neutral is in the integration of seniority lists, and the reason why that is special, why that's different than what this is, is that there is no right way to integrate a seniority list. What was this? Was it non-arbitrability of the issue put to the arbitrator? In essence, yes. That's part of the, on the claims on count one, the argument is, and I think the law establishes it, is that Railway Labor Act arbitration is for disputes between employees and the employer, or the union and the employer. Well, if the APA had not taken a neutral stance, I suppose Mr. Bounds would be in here arguing the same case that you are, right? No, Mr. Bounds is the plaintiff. I understand that, but suppose the arbitration had come out unfavorably to him, he'd be arguing the same thing. The arbitration did come out unfavorably to him. I'm sorry. I got it backwards. Okay. Sorry. It's very complicated procedurally, but I'm saying, right? Well, no, Your Honor, and here's the reason why. The neutral stance, the analogy I used in the brief, I think, is a good one. There's an intersectional collision. Both drivers claim that they had the green light. There's a witness standing there. They can see which one had the green light and which one didn't, but they refuse to testify and say, I'm neutral in this dispute. I'm neutral. Well, they know who has the green light, and by feigning neutrality, they are benefiting the person with the red light. That is what APA did here. They knew they had an agreement with American that the Category 1 aircraft would not be included in the trigger to eliminate the TWA pilots from job protections. And instead of saying, yes, we had this agreement, and yes, we have enforced this agreement throughout, they said, oh, we're neutral. We're not taking a position. And that neutrality was a fake, and it was in bad faith, and it was designed to aid the people who, if they had expressed the truth, would not be benefited. So the first DFR was, as I said, allowing the thing to go to arbitration at all, not simply denying the grievance that they had previously. Well, the district court treats your contentions at some length and says, number one, plaintiffs assert no facts that indicate there was a legally enforceable contract regarding the interpretation of any aircraft. Number two, even if APA had previously said that any aircraft did not include Group 1, that did not preclude the union from shifting its position. All right. Your Honor, yes. That's what the trial judge said, and that's where he erred. He's considering this thing as a policy, that APA had a policy with regard to how to view Category 1 aircraft. And policies can change. He's correct in that. But this was not a policy. This was an agreement. This was an exchange. There was an exchange of documents. They modified the language of the Supplement C. As you recall, Supplement C was the product, indirect product of an earlier arbitration on the letter of agreement 12-05. Didn't have an integration clause or a, you know, comprehensive clause that nothing is allowed to modify this agreement and all that sort of thing? No. I don't believe there's such a clause. And in addition, under labor law, the parties can, what was referred to as industrial common law. Well, I understand that. But, yeah, but exchange of letters doesn't necessarily satisfy that as a matter of law, does it? Well, so there's exchange of letters. There's also the way, the history of the text editing. All right. So the original Supplement C.C., which was vacated into bankruptcy, the original Supplement C.C. had a very similar trigger language. And the trigger language said that when this particular pilot could reach a certain level on any aircraft, then the extra rights that TWA pilots had would expire. The arbitration panel, the LOA 12-05 arbitration panel, their order modified that language. Their order said any aircraft, including a Category 1 aircraft. That's what the arbitration panel in the 12-05 said. When APA and American then went to draft the contract language, which is their agreement, all right, the contract language for what this protection is going to be, they wrote back and forth and said, no, Category 1 isn't it. They cut off the Category 1 language that had been added by the arbitration panel and then went back to the language that was back in Supplement C.C., which was any aircraft. And then at several different points in time, they agreed. And the president, the former president, whose name was... Were there Category 1 aircraft in the combined TWA American at that time? No. No, there were no Category 1 aircraft. Then they could have struck it because it was irrelevant. No. Sorry if it's unclear. In the original Supplement C.C., when that was done during the TWA American merger, there were no Category 1 aircraft. When the... Bankruptcy. At the bankruptcy, during bankruptcy, they're looking at merging with US Air. US Air had this small group of Category 1 aircraft. The arbitrators in the 12-05 said any aircraft, including Category 1. The lawyers who then were writing the document for the company and the union said, no, we don't want to include Category 1 as a trigger removal. So they deleted that addition. It would have been better if they had, instead of deleted it, changed the word including and changed it to excluding. And we wouldn't have a dispute here at all. But they didn't take that better drafting approach. Instead they said, no, we're taking out this change that the arbitrators made. And remember, they're not bound by the arbitrator's decision. They have arbitration on this area because they can't make an agreement themselves. It's to help them form a contract. If they're able to form a contract on certain aspects, they have the right to do that. They don't give up their right to contract by going to arbitration to resolve their differences. So I see I've got almost no time left. Let me really rapidly hit some of the other things. Although the judge calls it a policy, it's not a policy. They can change policies. They can't change the agreements. And the Savant case and the Sanderson case, which are both your decisions, which are discussed on pages 25 through 27 of our opening brief, talk about how, for example, an unsigned memo of understanding, which is not a contract, is binding. How an oral agreement saying, yeah, we agree to this thing but never reduced to writing, that's still binding as part of a collective bargaining agreement. So there are multiple violations of the DFR. And at least, at least there's enough there for a jury to decide whether what APA did was right or wrong. And that's what we're here for. Remember, we're here on appeal from a grant of summary judgment saying no jury could find. And here a jury could find. Regarding neutrality, they say you have to be neutral in seniority. That's not the case here. This is not putting together a seniority list. This is interpreting an existing agreement. And even when an existing agreement may favor some and not others, it's still – you've still got to make a decision. The union has a duty to make a decision. Vaca v. Sips, the Humphrey case, which we cite, both talk about that. You've got to make a decision, and you've got to make a decision even if it's tough. Okay, yeah. Do you want to talk about standing for an extra minute? I can. On the standing issue, your case, Mitchell case, does say that if the employee shows a violation of the duty of fair representation by the union, the employee has standing to challenge the grievance process. Since we have, in count two at least, made an issue of fact regarding DFR, then we've established at least standing at this stage for count one. There you go. Okay. Thank you. Thank you. Ms. Wong? Good morning. Good morning. My name is Alice Wong, representing Defendant Appellee Allied Pilots Association, or the APA. After consulting with Counsel for American Airlines, I'd like to focus my presentation today on plaintiff's claim against the APA for breach of the duty of fair representation, the DFR claim, and rely on our briefing and Counsel for American to address plaintiff's lack of standing and the vacature claim. Okay. Reduced to its essentials, this case is about APA accommodating one of the plaintiffs, Keith Bounds, and enabling him to participate in the arbitration of grievances that were filed by other pilots. It's a process in which he was fully represented by Counsel and allowed to present all of the evidence to the arbitrator that the plaintiffs present here before this court. The arbitrator, Richard Block, who was interpreting an agreement that he and a panel of other well-respected arbitrators had devised, ruled against plaintiff Bounds' position based on his interpretation of the agreement's plain language. That constitutes anything but a breach of the duty of fair representation. I'm hoping to cover two legal issues today. First, regardless of whether any of APA's conduct was arbitrary, discriminatory, or in bad faith, plaintiffs have failed to demonstrate a genuine issue of material fact as to causation, which is a critical element of their DFR claim on which they bear the burden of proof. And second, APA's submission of this intra-union dispute to arbitration was reasonable as a matter of law, given the zero-sum nature of the dispute in which one pilot group benefits only at the expense of another pilot group that's also represented by the APA. Turning first to causation, to survive summary judgment, plaintiffs had to show that the APA's conduct contributed to the erroneous outcome of contractual proceedings, that the union's actions affected the arbitrator's award. Summary judgment was appropriate in this case because plaintiffs have failed to make that showing. They've failed to make to show that the result would have been affected. And let's walk through some of plaintiff's allegations here. Plaintiffs fault the APA for remaining neutral during the arbitration. I believe your main complaint that I heard was submitting it to arbitration to begin with. Yes, Your Honor. And that goes to my second point on the zero-sum. And I can address that first. The duty of fair representation requires the APA to balance the interests of the former TWA pilots and all the other pilots that it represents. APA here was faced with a zero-sum game. Again, if American had maintained the Supplement C fence, then the legacy American pilots would lose out and the former TWA pilots would gain at their expense. And the reverse is true if American drops the fence. And we've cited numerous cases in our briefs that have held that when a union is faced with this kind of zero-sum situation where two subgroups of union members have directly competing interests, that a union's submission of that dispute to arbitration is reasonable. The best case, I think, on that issue is the Gvazdanovich case from the Second Circuit. Plaintiff's counsel tries to get away from that case law by saying that this case doesn't involve the formation of a seniority list. Technically, that's true. This case does not involve the formation of a seniority list. However, the dispute over whether the Supplement C protections have ended implicates the same issues as seniority integration. It's about what flying opportunities these pilots get to bid for. And in a way, this case is seniority plus because the preferential flying rights that were erected by Supplement C actually trump a pilot's ranking on the seniority list. So it implicates the same interests and more so. And so because APA was faced in this case with a zero-sum game, it treated both groups equally. It gave them equal funding and allowed them, each group, a full opportunity to advocate their positions before a neutral arbitration. What do you say, though, to his argument that it was so clear that the airline and the union had agreed that the Group 1 aircraft wouldn't count as far as that guy's ability to bid? I mean, what do you say about the fact that there was a clear agreement that they would not count? I think we have to look at whose agreement matters here. Supplement C was an agreement that was devised by interest arbitrators under Letter of Agreement 1205. The APA and American agreed to be bound by the interest arbitrator's ruling, and that's what they decided. To the extent that the email exchange constitutes APA and American's shared understanding at one point of what the interest arbitrators meant when they said the trigger ends with any aircraft, it's not dispositive. It's arbitrator block's interpretation of what the interest arbitrator meant that's dispositive. And also, to the extent that APA and American's interpretation of what the arbitrators meant was relevant, and you asked this question to the plaintiffs, that evidence was all presented to the arbitrator. The email exchange was introduced as an exhibit, and the plaintiff bounds presented testimony from the former APA president who was president during the LOA 1205 arbitration, and he also presented testimony from the chairman and the counsel to the Legacy American Pilots Committee during the Legacy 1205 arbitration. And so the arbitrator considered all that evidence and still found that what the LOA 1205 arbitrators meant by any aircraft was any aircraft. He relied on the plain language of Supplement C and also looked at the award that was written by the LOA 1205 arbitrators. So again— Assuming—you would assume that even though it was clear that they had this agreement, nevertheless, the airline was not at fault for submitting its arbitration. I think it depends on what you mean by agreement. There's—I think the email exchanges, it's— Normally, if this were under like a standard labor grievance thing, we would not be able to overturn the arbitrator's decision unless he were so far outside the bounds of the contract as to be irrational, correct? That's correct. And therefore, I do not see how the union can—or the pilots can take the position that they disagree with a contract interpretation even though the arbitrator found it different, and therefore, that proves that the union was not representing them fairly. See what I'm saying? Yes, I agree with that. And it's important to keep in mind that plaintiff's argument that we should never have made it to arbitration, that requires sweeping away the legacy American pilot grievances. And their grievance was based on a plain language interpretation of the contract. The legacy American pilot grievance were saying the trigger was met when any—when—because any aircraft means any aircraft. APA could not very well just sweep away those grievances and just deny those pilots a chance to get their dispute arbitrated because, well, we'd be facing a—we'd be here facing a different lawsuit from those plaintiffs. And that's precisely why the zero-sum case law that we've cited holds that it's reasonable for the union, when faced in this kind—when faced with this kind of situation, to submit that dispute to arbitration. And again, this was an arbitration in which plaintiff bounds was fully represented by counsel. We gave each—the APA gave each side equal funding, and they had all the opportunity in the world to present the same evidence and arguments that they pointed to here. And the arbitrator who wrote and who devised the contested language at issue, he interpreted the language that he and the other arbitrators came up with in a way that disfavored plaintiff bounds, but that does not make it a breach of the duty of fair representation. On the issue of causation, one other thing that they talk about is that we—that the APA skipped various pre-arbitration steps from the collective bargaining agreements—grievance process. I note that this was agreed to by all of the grievance, including plaintiff bounds. But the legacy American pilot grievances were filed months earlier. The earliest was filed four months before plaintiff bounds' grievance was filed. So those—so if we had gone through all of the steps for plaintiff bounds, the train would have left the station. The other grievances would have made it to arbitration before arbitrator block, and we'd still be here today. And so there's no—plaintiffs haven't made the showing, and it's their burden to make that showing, that going through all the steps would have changed anything. And to the extent that APA streamlined the process at all, it was to give plaintiff bounds a chance. Plaintiff bounds himself concedes in their briefing that he didn't have a grievance against American. American did what plaintiff bounds wanted. They kept the fence up. If we had followed the—if we had applied the CBA strictly, he wouldn't have had a grievance, and the legacy American pilots would have been—would have gone to arbitration before arbitrator block, and plaintiff bounds wouldn't have had a say. To the extent we streamlined the process at all, it was to give plaintiff bounds a chance, to give him a chance to advocate his case and present his evidence and arguments to the arbitrator. He lost, but, again, that does not make it a breach of the duty of fair representation. I think we have your argument. Thank you very much. Do you happen to know Babette Ciccotti? I'm sorry? Babette Ciccotti, Cohen, Weiss, and Simon. I think it's her firm in New York. I do not. I thought they used to represent ALPA, but, oh, well. I was wondering. Thank you. Uh-huh. All right. Who's the next one? McGinnis? Mr. McGinnis? Good morning, Your Honors, and may it please the Court. I'm the attorney for American Airlines, and American is a defendant only in count one of the second amended complaint, which is a count under the Railway Labor Act to vacate the arbitration award, which the district court correctly dismissed because the plaintiffs lacked standing. Now, contrary to what the plaintiffs have argued in their briefing in this matter, the Fifth Circuit has rejected the notion that individual employees have a broad right under the Railway Labor Act to challenge the decision of a system board. In the controlling authority on point, this Court has held the opposite, that an aggrieved employee generally will lack standing under the Railway Labor Act to assert a claim challenging an arbitration decision from a system board. And I'd like to quote, if I can, from the controlling authority, which is Mitchell v. Continental Airlines at 481F3233, note 24. The Court's counsel agreed that his argument on standing depends on whether he has a jury question on the duty of fair representation. Didn't he concede that? Well, that's what he said up here. I don't think he conceded, but I think he conceded that if he's got a DFR claim or he argued that if he has a DFR claim, then he's got standing under count one. There's other arguments in the brief, but, Your Honors, that is not what Mitchell held. Pleading a DFR claim does not get you a claim under the Railway Labor Act to vacate the arbitration award. What Mitchell held was that if the union controls the grievance procedure, if the union has the right to decide whether or not to process a grievance to arbitration, then an employee has no standing under the Railway Labor Act to bring a separate and independent claim to vacate the arbitration decision. What an employee can do, even though they do not have standing under the Railway Labor Act to vacate the award, they can sue the union if they have the facts for a breach of the duty of fair representation. And as a remedy for that claim, they can seek to vacate the arbitration award. And I'd like to, if I can, read you what I think is the controlling language in the Mitchell decision, which is at page 234. The court says, When a CBA that is formed pursuant to the RLA establishes a mandatory binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of aggrieved employees, one whose employment is governed by the CBA lacks standing to attack the results of the grievance process in court, except only that an employee has standing to bring a claim of unfair representation. So it may be a bit of a metaphysical distinction, but the Mitchell court is not saying you have standing under the Railway Labor Act to challenge the award of the arbitrator. The Mitchell court is saying, if you can, you have standing to sue the union for breach of the DFR, which in this case we don't think that the plaintiffs have stated the facts to do that. But if you can do that, as Mitchell says, an employee has standing to bring a claim of unfair representation. So we don't think the proper interpretation of Mitchell, even if this court were to find a breach of the DFR, is to reinstate count one of the complaint. That count was correctly dismissed because a DFR claim does not all of a sudden infuse an employee with standing under the Railway Labor Act on a separate and independent cause of action to sue for breach of the duty of fair representation. If I may, I would like to address a couple of the other arguments that the union makes in its brief. First, the union argues that under Section 3 of the Railway Labor Act that employees have a right to sue individually to challenge the award of an arbitrator. But both the Mitchell and a later decision, the McKenzie decision, which came after Mitchell and reaffirms the holding in Mitchell, considered and rejected the same argument. In both of those cases, this court held that in circumstances like the present one, where a contractual grievance would impact the bargaining unit generally, an employee does not have standing to sue to vacate the arbitrator's award. The panels both reserved judgment on whether Section 3 ever provides standing to an individual employee, holding out the possibility that there might be standing for what they call a uniquely individual grievance, something like a pilot who's discharged and there's a decision about good cause and maybe there's a due process issue as to the arbitration. If it's uniquely individual and it's not going to implicate the bargaining unit as a whole, that's the only situation that Mitchell and McKenzie even suggested might possibly give the individual employees standing under Section 3. In their reply briefs, the plaintiffs contend that they have standing under Mitchell because the Mitchell decision and the McKenzie decision apply only when it's the union that obtains the result at the arbitration. And in this case, they're contending that the union remained neutral, so it's not the union that actually obtained the result at the arbitration hearing. But the district court considered this argument and properly rejected it under Mitchell. And the facts of the Mitchell case are important. Mitchell involved a number of grievances where the flight attendants working for the airline, Continental Airlines, were contending that their seniority was not properly credited. And the union had agreed to represent them in that case at the hearing, and the flight attendants and the unions had, in fact, met more than once prior to the arbitration hearing in order to prepare for the arbitration. Then, at the very last minute, immediately before the arbitration, the union said, Hey, we're not going to represent you. You're going to have to go into the arbitration. You're going to have to handle this yourself. And the employees in their complaint characterized that as an ambush and said that as a result they acknowledged that they presented a deficient pro se case. So even then, which is light years away from what we have here, where the union was neutral but gave money and gave these employees the opportunity to retain counsel, paid for the counsel. These were very good counsel who have a history and an experience with the Railway Labor Act. In Mitchell, the union just said, Right as the hearing was about to start, you're on your own. And the court still held that even under those circumstances, that the employees did not have standing to challenge the award under the Railway Labor Act. So I submit, Your Honor, that in this case there's no standing under count one under any circumstances, even if this panel were somehow to decide that there was an issue of fact on the DFR claim. Thank you. All right. Mr. Jacobson, rebuttal. Thank you, Your Honor. With regard to the issue of causation, I think the causation here is very simple. If the union had complied with the duty of representation, it would not have put these grievances forward, would not have arbitrated. Without arbitration, there's no award. I can't see a more direct causation. The question isn't whether or not we could have somehow gotten the arbitrator to make a different decision. The question is, should the arbitrator have been deciding at all? And the answer, we believe, is no, based on their agreement. The argument that Block was ruling on his arbitration award and not on a contract between the parties is just contrary to the record, contrary to the evidence. The arbitration award then was looked at by the parties and using the- How would it have played out? And I'm sure you- how would it have played out if the union had taken your client's position? If the union had taken- then there would have been no arbitration and the status quo would have continued. No, the status quo wouldn't have continued. The other group of pilots would have insisted on asserting their rights, correct? The status quo would have continued, Your Honor. There have been two prior occasions in which a legacy American pilot has said that the trigger was gone and the union said, no, that's not our agreement. The trigger has not been activated, and we continued. The fact that they keep coming back with new grievances, the union should have continued to respond in the same way. They changed their- not their policy. They decided not to follow their agreement, and that's what caused the problem. In addition to the causation- But again- Yes. I mean, the other- but the other pilots could have asserted something based on what they considered to be the status of Supplement C. Applying language of the contract. Right, and that's what they had done, and they'd done it previously, and the union had rejected it, and ultimately they got their guy elected president who took their position. But that is not a policy change. That is a decision. Deciding not to follow your contract is not a policy decision. It's a breach of contract, and that decision to pretend to be neutral on something where you had a position- Well, the problem- I mean, I'm just saying. The problem I have with it is that I think it's even in Judge Fitzwater's opinion that the status of Supplement C was highly- or any aircraft was highly disputed. There are disputes. There was not record evidence of it. There was a hearsay affidavit submitted on support of that, but even if it's disputed, that doesn't stop it. If you look at your case, the Turner case, versus air- I wrote it down. Air transport. We discussed it in our reply brief on page 13. It says just because there's strong disputes and one group of employees will be disadvantaged by a decision either way doesn't mean the union doesn't have to make the decision and make the right decision based on what it knows at the time. So the fact- and that ties into the zero-sum argument they make. This is not a zero-sum. She says it's like seniority plus because this gives the former TWA pilots rights beyond what the seniority would give them, but it's not seniority plus. That part, the seniority part or the seniority plus part, that was determined in the 1205 arbitration, which then led to the parties entering into their Supplement C agreement. That resolved those issues. This was simply do we comply with our agreement. For analogy, we have two- lower seniority number is better. Seniority number one gets to pick whatever they want to do, and then sorry to you, it's anything that's left over. If you have, imagine seniority's 1,000 and 1,001. If number 1,001 files a grievance saying, hey, I don't like that number 1,000 is picking his job ahead of me, the union is going to say, hey, you're 1,001. That's the list. That's the deal. Even though as between 1,000 and 1,001, it's a zero-sum game. If 1,001 gets to pick before 1,000, he gains by the same amount that 1,001 loses. It's a zero-sum game. It's not something that the union can grieve. And if for some reason 1,001 is allowed to pick before and 1,000 says, wait a second, he got to pick before I have a grievance, if the union says, well, we're neutral on this, you know, again, that's a violation of the DFR. That's not exactly the situation, but it's analogous to the situation. Here we had a group of pilots who were displaced from the status quo of where they were because another group of pilots said we would like the advantages, the little bit of advantages these people managed to retain from the merger. And there was an agreement in place, and neither of them disagreed that there was an agreement. What they said was, well, our agreement didn't count. The arbitrator is deciding what he decided in his arbitration. But the language he decided in his arbitration isn't the language at issue here. The language the arbitrators came up with, any aircraft including Category 1. The language of Supplement C is any aircraft, excising the including Category 1 language. And moreover, Supplement C is the agreement reached by the union and the employer. Yes, they were informed by the arbitration award. Yes, they're trying to implement the arbitration award, but it's its own agreement and it has its own provisions within it for dispute resolution referring back to the collective bargaining agreement, not referring back to the lot of agreement 1205 procedures. It's an agreement, and that's their intent is what governs. And so while they don't deny their intent, they say their intent is not valuable. Yes, Your Honor, I'm sorry. You have another question. We have your argument. Thank you very much. I appreciate it. All right. Not a problem.